Argued and submitted November 4, 1991, judgments of conviction for aggravated murder and aggravated felony murder affirmed, sentence of death vacated, case remanded to circuit court for further proceedings July 9, reconsideration denied August 25, 1992

# STATE OF OREGON,
*Respondent,*

*v.*

# DAYTON LEROY ROGERS,
*Appellant.*

(CC 88-355, 88-356, 88-357,
88-358, 88-359, 88-360;
SC S36344)

836 P2d 1308

357-a

Diane L. Alessi, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender, Salem.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Ann Kelley, Diane S. Lefkow, and Janet A. Metcalf, Assistant Attorneys General, Salem.

PETERSON, J.

Fadeley, J., dissented in part and filed an opinion.

## PETERSON, J.

Defendant appeals his convictions of 13 counts of aggravated murder and his sentence of death for causing the deaths of six women. Defendant challenges both the guilt and penalty phases of his trial. Because we conclude that no reversible error was committed in the guilt phase, we affirm defendant's convictions for aggravated murder. However, under this court's decision in *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den* 111 S Ct 212 (1990) (*Wagner II*), defendant is entitled to a new penalty-phase proceeding.

## SUMMARY OF FACTS

The jury found defendant guilty. We therefore set forth the facts in the light most favorable to the state. *State v. Rose*, 311 Or 274, 276, 810 P2d 839 (1991).

On August 31, 1987, a hunter discovered a woman's body underneath some matted ferns in the Molalla Forest. He called the police and later took them to the body. Over the course of the following week, the bodies of six more women were found in the same general area. All the bodies were naked and in various stages of decomposition. Six of the seven women were identified; the seventh remains unidentified.

The State Medical Examiner performed autopsies and determined the cause of death of each of the women to be homicidal violence of an undetermined type. The medical examiner estimated that the bodies had been in the forest from one to three months. Because of the decomposition of the bodies, the medical examiner could not rule out strangulation as a cause of death and could not determine whether the various wounds to the victims had been inflicted before or after death. The medical examiner described the injuries to each identified victim as follows:

(1) Gyles: Six stab wounds to the lower back. The bone of one lower leg had been sawed through, and the foot had been sawed at ankle level.

(2) Mock: Deep stab wounds to the lower back region. Both feet had been sawed off at the ankle and were found underneath the body. There were multiple saw marks on the right thigh bone just above the knee.

(3)   Cervantes: Abdomen split open with sharp object from below the breast bone to the pubic area. The right nipple appeared to have been cut, and the left nipple had been cut and removed.

(4)   DeVore: The body was totally skeletonized. The upper back revealed stabbing injuries.

(5)   Adams:  There were stab wounds to the back, and the right foot had been severed at the ankle. The hands were bound by a dog collar with the arms above the head when the body was found.

(6)   Hodges: The remains were scattered by animals. The legs below the knees were not found. The lower back revealed stabbing injuries.

At the site where the bodies were found, officers found various items. Approximately 38 miniature bottles of a particular brand of vodka, a cardboard sleeve that would hold 10 miniature vodka bottles, and 34 orange juice containers were found at the crime scene. A knife with human tissue on it was found near two of the bodies. Additionally, investigators found several items that had been tied into knots, including pantyhose, shoelaces, rope, and a cloth. They also found a dog collar, in addition to the one that was binding Adams' hands, and pieces of wire.

Defendant already was in police custody as a suspect in another killing when the seven bodies were found in the Molalla Forest. In that other killing, which had occurred in the early morning hours of August 7, 1987, the victim was Jennifer Smith, a prostitute. Defendant had picked up Smith in Portland and had driven with her to a 7-Eleven store and then to the parking lot of a Denny's restaurant on McLoughlin Boulevard in Clackamas County. Defendant asked that Smith allow him to tie her up so that he could massage her and masturbate. Smith removed her clothes. Defendant then tied her with shoelaces that he had in his pickup truck. Smith was tied so that she was on her knees facing the back of the seat with her hands and feet tied behind her against the dashboard.

At about 2:30 or 3 a.m. on the morning of August 7, several witnesses near the Denny's parking lot heard a

woman screaming. One of the witnesses ran toward the source of the screams, but as he got closer, the screams stopped. The witness saw defendant standing between Smith's legs. Smith was naked and bleeding and she was having difficulty breathing. The witness yelled at defendant, and defendant ran from the parking lot, carrying a knife. Defendant ran around and behind a nearby building, where he dropped the knife. He then ran back to his pickup truck, which was parked about 45 feet from where Smith was lying, and drove away. Another Denny's customer followed defendant and obtained his license plate number.

Defendant drove to his small engine repair shop in Woodburn. There was blood all over the passenger side of his truck. He attempted to wash off the blood with a shop rag and sponge. He burned his blood-soaked clothing and a tennis shoe and some clothing belonging to Smith in a wood stove in the shop. The police arrived at defendant's shop at 5:35 a.m. Defendant's pickup truck was parked in front and its radiator was still warm. The police saw blood in front of the shop door. Defendant, who was inside the shop, was arrested. He had a strong odor of alcohol and told a detective that he had "bought some miniatures at the liquor store." Defendant had purchased a 10-pack of vodka miniatures — the same brand of vodka as the bottles found at the Molalla Forest crime scene — from the Woodburn liquor store the previous evening.

Smith bled to death from stab wounds to her chest. She also had stab wounds in her abdomen, in her breasts and nipples, and a complex v-shaped stab wound on her back. The stab wounds were consistent with the knife with which defendant fled and which was found behind the nearby building around which defendant ran. Smith had numerous defensive injuries to her hands and arms, and her wrists showed recent bruises that could have been caused by the knotted shoelaces that defendant had used to bind her.

Near the Denny's parking lot, the police recovered the knife that defendant had dropped while running. That knife was the same model as the knife later found at the Molalla Forest crime scene. The police found knotted shoelaces, one of Smith's tennis shoes, and most of Smith's clothing near where defendant's pickup truck had been

parked. They also seized evidence from defendant's shop and pickup truck. From his shop, the police seized a hacksaw that could have caused the saw marks on the legs of some of the Molalla Forest victims. In the ashes of the shop's wood stove, the police found a shoe shank, eyelets, and swivels from Smith's other tennis shoe; shoe shanks from two other pairs of shoes; shoe eyes; shoe nails; burned and partially burned fabric; numerous brassiere parts; snap fasteners; decorative metal parts and clothing studs from women's clothing, including star-shaped studs later identified as studs from Adams' pants; buttons; numerous zipper parts; earring pieces; and belt buckles. The police also seized defendant's boots, which had blood stains on them.

In defendant's truck, the police found a bungi cord, a green pull tab from a juice container similar to the containers later found at the Molalla Forest crime scene, numerous blood stains, and several human hairs. Some of the blood stains found were made by type O blood of the same subtype as Smith's blood. Type O blood of the same subtype as defendant's blood — a subtype that is inconsistent with Smith's blood subtype — also was found in defendant's truck. Other blood stains were found in the truck on the passenger seat, seat back, and floor that were types O and A. Cervantes and Adams also had type O blood; Gyles' blood was type A. Of the human hairs found, several were macroscopically and microscopically similar to Mock's hair, two hairs were consistent with Cervantes' hair, and two hairs were consistent with DeVore's hair. The police also noted that the passenger side door panel, ceiling, and seat were cut.

While the state's investigation of the Molalla Forest killings was continuing, defendant was indicted, tried, and convicted of aggravated murder for causing the death of Jennifer Smith. During the guilt phase of that trial, the court refused to permit the introduction of evidence regarding the Molalla Forest victims. The state did not offer that evidence during the penalty phase of the Smith homicide trial. In the penalty phase, pursuant to ORS 163.150 (1987), see note 9, *post*, the jury was asked three questions:

"[1] Was the conduct of the defendant, Dayton Leroy Rogers, that caused the death of Jennifer Lisa Smith committed deliberately and with the reasonable expectation that the death of Jennifer Lisa Smith would result?"

"[2] Is there a probability that the defendant, Dayton Leroy Rogers, would commit criminal acts of violence that would constitute a continuing threat to society?"

"[3] Was the conduct of the defendant, Dayton Leroy Rogers, in killing the deceased, Jennifer Lisa Smith, unreasonable in response to the provocation, if any, by the deceased, Jennifer Lisa Smith?"

The jury answered "no" to the first two questions, and "yes" to the third. Thus, although the jury concluded that the killing was unreasonable in response to any provocation from the victim, it did not conclude that defendant had acted deliberately when he killed Smith, and it did not conclude that it was probable that he would commit criminal acts of violence in the future that would constitute a continuing threat to society. Defendant therefore was not sentenced to death for the aggravated murder of Smith.

Shortly thereafter, defendant was indicted for the killings of the six identified Molalla Forest victims. The six indictments charged defendant with two counts of aggravated murder for each of the victims. The aggravated murder charges were based on murder in the course of torturing each victim, ORS 163.095(1)(e), and aggravated felony murder for murder during a kidnapping, ORS 163.095(2)(d) and 163.115(1)(b)(E) and (F). The indictment concerning the death of Cervantes also charged defendant with a third count of aggravated murder, for murder in the course of sexual abuse. ORS 163.095(2)(d) and 163.115(1)(b)(H).

At trial, the state presented evidence of defendant's killing of Smith, including defendant's testimony in the Smith murder trial. Additionally, the state presented evidence that the six Molalla Forest victims were prostitutes and offered the testimony of 11 other prostitutes who had "dated" defendant. The prostitute witnesses testified about defendant's conduct during their encounters with him. There was testimony concerning defendant's habit of mixing vodka from miniature bottles into small plastic orange juice containers. Several of the prostitute witnesses testified that defendant took them to areas in or near the Molalla Forest. They also testified about defendant's violent sexual proclivities, including, *inter alia*, (1) tying their hands and feet tightly behind them; (2) threatening to cut their breasts, feet,

and buttocks with a knife; (3) biting and pinching their breasts, feet, and buttocks; (4) inflicting pain on them until they stopped resisting, at which time he became uninterested; and (5) deceiving them about his intentions concerning their "dates."

The jury convicted defendant on all 13 counts of the six indictments concerning the deaths of the Molalla Forest victims. The jury then answered the penalty-phase questions "yes," thereby requiring the trial court to enter judgments of conviction and sentence of death. ORS 163.150(1)(f).

## ISSUES RELATING TO PRETRIAL MATTERS

In his first assignment of error, defendant contends that the trial court erred in denying his motion for a change of venue. He argues that prejudicial pretrial publicity made it impossible for him to receive a fair trial, thus violating his rights under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. With regard to change of venue, ORS 131.355 provides:

> "The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial."

We review the trial court's denial of a motion to change venue to determine whether the trial court abused its discretion. *State v. Little*, 249 Or 297, 312, 431 P2d 810 (1967), *cert den* 390 US 955 (1968). We address issues of state statutory and constitutional law before resolving issues of federal constitutional law. *Stelts v. State*, 299 Or 252, 257, 701 P2d 1047 (1985); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983). However, for purposes of this case, we assume, without deciding, that the analysis of the issue presented is the same under the statute and the state and federal constitutions, because defendant has "not suggest[ed] any different analysis under the [statute and] Oregon Constitution than under the United States Constitution." *Dept. of Trans. v. Lundberg*, 312 Or 568, 573 n 4, 825 P2d 641 (1992).

In the present case, defendant moved for a change of venue after the court and the parties had spent several weeks impaneling a jury. In order to ensure the impartiality of the jury, the court had taken special precautions; it ordered that each prospective juror be questioned separately and increased the number of peremptory challenges from 12 to 48 for each side. Defendant exhausted his 48 peremptory challenges. After hearing defendant's motion, the trial court found that the pretrial publicity had not been prejudicial, that any risk of prejudicial publicity had been diminished by the period of delay between defendant's trial for the Smith homicide and the trial in this case, and that any jurors with prior knowledge of the facts of this case or of defendant's prior conviction had indicated that they could and would base their verdicts on the evidence presented at trial and not on any prejudice against defendant. The court denied the motion for change of venue.

■■ The trial court carefully presided over the extensive jury selection process and was satisfied that the impaneled jurors could and would base their verdicts on the evidence presented. The trial court's determination that the jurors in the present case would be impartial is entitled to great weight. *State v. Montez*, 309 Or 564, 575, 789 P2d 1352 (1990); *see also Patton v. Yount*, 467 US 1025, 1036-38, 104 S Ct 2885, 81 L Ed 2d 847 (1984) (trial court's determination that an individual juror would be impartial is a finding of historical fact entitled to "special deference" on direct and collateral review). There is no evidence, nor any suggestion, that the trial below was a media circus such as would have prevented him from receiving a fair trial. *Cf. Sheppard v. Maxwell*, 384 US 333, 363, 86 S Ct 1507, 16 L Ed 2d 600 (1966) ("the state trial judge did not fulfill his duty to protect [the accused] from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom"). Nor was the jury exposed to information in media accounts that was not presented during trial.[1] *See Patton v.*

---

[1] Five jurors who sat on the case were aware that defendant had been convicted of killing Smith. Although the evidence in the present case did not include the fact of defendant's conviction, it did include the events that were the basis of that conviction. In any event, defendant did not specifically challenge any of the five for cause and the trial court determined to its satisfaction that those jurors would decide the case on the evidence and not on what they might have known before the trial. *See Patton v. Yount*, 467 US 1025, 1035-38, 104 S Ct 2885, 81 L Ed 2d 847 (1984)

*Yount, supra,* 467 US at 1035 ("The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant"); *accord State v. Savage,* 36 Or 191, 203, 60 P 610 (1900); *cf. Sheppard v. Maxwell, supra,* 384 US at 356-61 (noting prosecution and police leaks to media of information that was not admissible or offered at trial); *Marshall v. United States,* 360 US 310, 312-13, 79 S Ct 1171, 3 L Ed 2d 1250 (1959) (the defendant was entitled to a new trial where the trial court excluded evidence as too prejudicial, but the jury was exposed to that evidence through the news media). We find no abuse of discretion in the trial court's ruling.

Defendant next contends that the trial court erred in denying his motion for an order authorizing expenses for a pretrial public opinion poll. He wanted the poll in order to gauge the extent of pretrial publicity in Clackamas County about him and his connection to the Molalla Forest killings and the Smith homicide, in order to determine whether to seek severance of the six indictments for trial or whether he could receive a fair trial in Clackamas County.

■■ Defendant argues that the denial of his motion violated his rights under ORS 135.055(3) and his constitutional rights to adequate assistance of counsel, freedom from cruel and unusual punishment, and due process, citing Article I, section 11, of the Oregon Constitution, and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We first address defendant's statutory argument. *Stelts v. State, supra,* 299 Or at 257; *State v. Kennedy, supra,* 295 Or at 262.

ORS 135.055(3) provides in part:

"The person for whom counsel has been appointed is entitled to reasonable expenses for investigation, preparation and presentation of the case. The person or the counsel for the person may upon motion, which need not be disclosed to the district attorney prior to conclusion of the case, secure approval and authorization of payment of such expenses as

(upholding trial court's finding that jurors would be impartial despite the fact that some jurors remembered the case from the defendant's first trial).

the court finds are necessary and proper in the investigation, preparation and presentation of the case * * *."

This court has not decided what the appropriate standard of review is for a trial court's denial of an expense request under ORS 135.055(3). The Court of Appeals has concluded that the decision whether to allow an expense request "will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed." *State v. Acosta*, 41 Or App 257, 260, 597 P2d 1282 (1979); *accord State v. Gleason*, 100 Or App 236, 238-39, 785 P2d 376 (1990). We agree. Of course, the exercise of discretion is subject to an indigent defendant's constitutional right under the Fourteenth Amendment to the basic tools necessary for the preparation of an adequate defense. *Ake v. Oklahoma*, 470 US 68, 77, 105 S Ct 1087, 84 L Ed 2d 53 (1985). Where a defendant establishes the probable value of the assistance sought such that there is a significant risk of error in the proceedings if that assistance is denied, the defendant is entitled to that assistance at state expense. *Ibid.*; *see also Caldwell v. Mississippi*, 472 US 320, 323 n 1, 105 S Ct 2633, 86 L Ed 2d 231 (1985) (the denial of a court-appointed ballistics expert did not deprive the defendant of due process where he offered little more than undeveloped assertions that the requested assistance would be beneficial).

■　　　The trial court denied defendant's request for the expenses for the opinion poll, concluding that it was "satisfied that the individual voir dire of prospective jurors and the additional peremptory challenges will permit the selection of a jury unaffected by pretrial publicity." Implicit in the court's conclusion was that a pretrial public opinion poll was not "*necessary* and proper [for] the investigation, preparation and presentation of the case." ORS 135.055(3) (emphasis added). The trial court did not abuse its discretion in so finding.

As to the constitutional claims,[2] the trial court's provision for extensive *voir dire* allowed the court and counsel the opportunity to select a jury capable of deciding the case on

---

[2] Defendant has not argued that the analysis of his state constitutional claim, based on Article I, section 11, differs from the analysis of his federal constitutional claim under *Ake v. Oklahoma*, 470 US 68, 105 S Ct 1087, 84 L Ed 2d 53 (1985).

the evidence presented rather than on anything that the jurors might have heard outside the courtroom. Defendant failed to establish the probable value to him of the public opinion poll in light of the extensive *voir dire* provided or that there was a significant risk of error in the proceedings without the poll. *Ake v. Oklahoma, supra,* 470 US at 77. The trial court's denial of defendant's motion for expenses for a public opinion poll therefore did not violate his constitutional rights.

■    Defendant next contends that the trial court erred in denying his challenge for cause of all prospective jurors who knew of his earlier conviction for the aggravated murder of Smith. Specifically, defendant contends that "knowledge of the conviction was so prejudicial that it demonstrated an actual bias from which a prospective juror could not be rehabilitated." Because five of the jurors at trial were aware of defendant's conviction for the Smith murder, defendant asserts that he was not tried by an impartial jury, in violation of Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.

Defendant's contention is not persuasive. Although it is questionable whether the court committed error by refusing to excuse those five jurors,[3] any such error was harmless in the circumstances of the present case. Defendant's complaint is that the five jurors who knew of his conviction for the Smith murder necessarily would be biased against him. However, during the guilt phase of his trial, the state introduced extensive evidence concerning the Smith murder. Because the jury heard substantial evidence about the Smith murder, any concern about prejudice that might have resulted from some jurors' having knowledge that other jurors did not have was obviated, and any prejudice resulting solely from the five jurors' prior knowledge would be, at most, insignificant. *State v. Pinnell,* 311 Or 98, 109, 806 P2d 110 (1991). We conclude, therefore, that there was little, if any, likelihood that those jurors' prior knowledge affected the

---

[3] As discussed *ante,* a prospective juror's prior knowledge concerning a case does not disqualify the juror unless the juror has "such fixed opinions that [he or she] could not judge impartially the guilt of the defendant." *Patton v. Yount, supra* note 1, 467 US at 1035; *accord State v. Savage,* 36 Or 191, 203, 60 P 610 (1900).

jury's verdict. *Ibid.*; *State v. Isom*, 306 Or 587, 595-96, 761 P2d 524 (1988) (explaining standard for harmless error).

■    In his next assignment of error, defendant contends that the trial court erred in denying his challenge for cause of juror Morgan. He argues that Morgan's responses on *voir dire* indicated that she strongly approved of the death penalty and thus could not be an impartial juror, because she would vote to impose the death penalty if defendant were convicted. For essentially the same reasons, defendant also assigns as error the trial court's refusal to excuse juror Burklund.

With respect to both Morgan and Burklund, defendant's only argument is that they would have been biased *in the penalty phase* if defendant were convicted. Defendant never has contended that either juror would not be impartial during the guilt phase of his trial. Because defendant's sentence of death is being vacated and defendant will be receiving a new penalty-phase proceeding before a new jury, he has suffered no harm by the court's refusal to exclude Morgan and Burklund for cause. Thus, even if the trial court's denial of defendant's challenges to Morgan and Burklund for cause was in error, an issue we need not and do not decide, any error was harmless.

Defendant also assigns as error the trial court's granting of the state's challenge for cause of prospective juror Rohm, on the basis of her expression of opposition to the death penalty. The standard for excluding juror Rohm for cause is whether her views concerning capital punishment "would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions or [her] oath.' " *State v. Nefstad*, 309 Or 523, 536, 789 P2d 1326 (1990) (quoting *Wainwright v. Witt*, 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841 (1985)). The trial court's ruling granting the state's challenge for cause implicitly includes a finding that Rohm's views concerning capital punishment would prevent or substantially impair her performance of her duties as a juror. There is evidence in the record to support that finding. The trial court did not abuse its discretion in excluding prospective juror Rohm for cause. *State v. Montez, supra*, 309 Or at 574-76.

In his next three assignments of error, defendant contends that the trial court erred in denying his challenges for cause of prospective jurors Thomas, Somers, and Green for implied bias. The basis for defendant's challenge was ORS 136.220, which provides in part:

"A challenge for implied bias shall be allowed for any of the following causes and for no other:

"* * * * *

"(2)   Standing in the relation of * * * master and servant * * * with the:

"(a)   Defendant;

"(b)   Person alleged to be injured by the offense charged in the accusatory instrument; or

"(c)   Complainant.

"(3)   Being * * * in the employment of any person referred to in paragraph (a), (b) or (c) of subsection (2) of this section * * *."

Defendant argues that the state is the complainant in this case and that, because each of the three challenged jurors was employed by the state — Thomas as a maintenance worker on a bridge crew with the State Highway Division, Somers with the Motor Vehicles Division, and Green with the Oregon Health Sciences Center — the statute mandates their exclusion for cause for implied bias.[4] Defendant asserts that the trial court's refusal to allow his challenge for cause violated his statutory rights under ORS 136.220 and his constitutional rights to an impartial jury and a fair trial under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution.

■        In determining what the term "complainant" means in the context of ORS 136.220, we look to the legislation itself. The term "complainant," which was added to the statute in a

---

[4] Defendant asserts that *Garrison v. City of Portland*, 2 Or 123, 124 (1865), which held that taxpayers of a public body may not sit as jurors in any case in which the public body has a pecuniary interest, stands for the proposition that even a remote interest in the litigation is sufficient to disqualify a juror. However, as defendant acknowledges, *Garrison* has been overruled. *State ex rel Douglas County v. Sanders*, 294 Or 195, 200, 655 P2d 175 (1982) (the remote interest of a juror resulting from his or status as a taxpayer is insufficient to justify automatic disqualification).

1961 amendment to ORS 136.220, Or Laws 1961, ch 444, § 1,[5] is not defined in ORS chapter 136. The 1961 amendment to ORS 136.220 substituted the term "complainant" for the phrase "the person indorsed thereon as the prosecutor" in both subsections (1) and (2) of ORS 136.220.[6] The amendment also reworded and divided former subsection (2) into subsections (2)(a) to (c) and (3) and added the word "or information" after indictment in referring to the charging instrument.[7] It appears that the legislature intended no major substantive changes by the 1961 amendment. In the minutes of the Senate Judiciary Committee, the bill was referred to as a "housekeeping" amendment that would

---

[5] Oregon Laws 1961, chapter 444, section (1), with deleted language in brackets and new language italicized, provided in part:

"ORS 136.220 is amended to read:

"136.220 A challenge for implied bias may be taken for any of the following causes and for no other:

"(1) Consanguinity or affinity within the fourth degree to the person alleged to be injured by the crime charged in the indictment *or information*, to [the person indorsed thereon as the prosecutor] *the complainant* or to the defendant.

"(2) [Standing in the relation of guardian and ward, attorney and client, master and servant, or landlord and tenant with the defendant or the person alleged to be injured by the crime charged in the indictment or indorsed thereon as the prosecutor, or being a member of the family, a partner in business with, or in the employment on wages for, either of such persons, or being a surety or bail in the action or otherwise for the defendant.]

"*Standing in the relation of guardian and ward, attorney and client, master and servant or landlord and tenant with the:*

"*(a) Defendant;*

"*(b) Person alleged to be injured by the crime charged in the indictment or information; or*

"*(c) Complainant.*

"*(3) Being a member of the family, a partner in business with or in the employment of any person referred to in paragraph (a), (b) or (c) of subsection (2) of this section or a surety or bail in the action or otherwise for the defendant.*"

[6] The original bill proposing the amendment of ORS 136.220 provided that "a witness" should be substituted for "the person indorsed thereon as the prosecutor" in ORS 136.220(1). The House Judiciary Committee amended the bill by substituting "the complainant" for "a witness" before reporting it to the floor of the House with a "do pass as amended" recommendation. Minutes, House Judiciary Committee (HB 1171), March 2, 1961, at p 4. With regard to subsection (2) of ORS 136.220 — the provision at issue here — "the complainant" appeared in both the original bill and the bill enacted by the legislature.

[7] The phrase "the crime charged in the indictment or information" has since been replaced by "the offense charged in the accusatory instrument." Or Laws 1973, ch 836, § 232.

"delete 'prosecutor' because the private prosecutor no longer exists in the law." Minutes, Senate Judiciary Committee (HB 1171), April 13, 1961. There is nothing to suggest that the legislature intended that the state would be the "complainant" and, thus, that all state employees must be disqualified for implied bias from serving on all criminal juries. The language of ORS 136.220, as well as the usage of the term "complainant" elsewhere in the Oregon Revised Statutes, suggests that the legislature intended the term to have a much more limited meaning.

ORS 136.220(3) lists three types of relationships — familial, business partnership, and employment — that give rise to an implied bias sufficient for disqualification. ORS 136.220(3) suggests that the complainant, one of the "person[s]" referred to in ORS 136.220(2)(c), is not the state, because "person" does not ordinarily include the state. *See* ORS 174.100(4) (defining "person" broadly, but not so broadly as to include the state). Because the complainant is a "person," and the state is not a "person," the state is not the complainant referred to in ORS 136.220.

Other provisions support this reading of ORS 136.220. In ORS 135.165, the legislature has distinguished between the complainant and the state, thereby implying that the complainant is not the state. That statute provides:

> "The *complainant may employ counsel* to appear against the defendant in every stage of the preliminary hearing; *but the district attorney for the county*, either in person or by some attorney authorized to act for the district attorney, *is entitled to appear on behalf of the state* and control and direct the prosecution." ORS 135.165 (emphasis added).

In defining the parties in a criminal action, ORS 131.025 provides that "the State of Oregon is the plaintiff," not that the state is the "complainant." The statutory definition of a "[c]omplainant's information" as "a written accusation, verified by the oath of a person," ORS 131.005(4), in contrast to a "[d]istrict attorney's information," which is "a written accusation by a district attorney," ORS 131.005(9), also suggests that the legislature did not intend the term "complainant" to mean the state. Although it is clear that the complainant is not necessarily the victim of the crime — ORS 136.220(1) and (2)(b) separately refer to "the person alleged to be injured by

the offense charged" and "the complainant" — we conclude that the legislature did not intend the broad definition asserted by defendant. Rather, we read ORS 136.220(2)(c) and (3) as providing for the disqualification for implied bias of persons in the specified relationship to persons who verify or swear to an accusatory instrument, such as a prosecuting attorney or grand jurors.

In the present case, there is no contention that any of three jurors challenged for implied bias under ORS 136.220 was employed by the district attorney or any of the grand jurors who returned the indictment. Thus, none of the three jurors could be challenged for implied bias under ORS 136.220, and the trial court did not err in denying defendant's challenge on that ground.

Further, because defendant has not asserted that any of the three jurors was actually biased or incapable of being an impartial juror, there can be no successful contention that defendant's state or federal *constitutional* rights to a fair and impartial jury were violated. *See State v. Montez, supra,* 309 Or at 594 (rejecting the "argument that 'common sense and human experience' suggest that * * * a police officer[] could not serve as a fair and impartial juror in [a capital] case"); *see also United States v. Wood,* 299 US 123, 147-50, 57 S Ct 177, 81 L Ed 78 (1936) (rejecting "imputation of bias simply by virtue of governmental employment"). Because neither ORS 136.220 nor the state or federal constitution required the disqualification of the state-employee jurors, defendant's claim is not well taken.

## ISSUE PRECLUSION

In defendant's next assignment of error, he argues that the trial court erred in denying his motion to declare him ineligible for the death penalty.[8] He asserts that the sentencing jury's verdict in the Smith murder trial precluded the state from relitigating the issue of his future dangerousness

---

[8] Although this error is considered more appropriately as a penalty-phase assignment of error, defendant has grouped it with his guilt-phase assignments of error, apparently because the motion was made during the pretrial proceedings. In any event, we will decide this penalty-phase issue, because, if defendant is correct, the state may not seek to impose the death penalty in this case and it would be pointless to remand for a new penalty-phase proceeding.

and, thus, from seeking the death penalty for the Molalla Forest murders.

■ Pursuant to ORS 163.150(1)(b) (1987),[9] the sentencing jury in the Smith homicide trial returned the following verdict on the three penalty-phase questions submitted:

"One, was the conduct of the defendant, Dayton Leroy Rogers, that caused the death of Jennifer Lisa Smith committed deliberately and with the reasonable expectation that the death of Jennifer Lisa Smith would result?

"Answer. No.

"Two. Is there a probability that the defendant, Dayton Leroy Rogers, would commit criminal acts of violence that would constitute a continuing threat to society?

"Answer. No.

"Three. Was the conduct of defendant, Dayton Leroy Rogers, in killing the deceased, Jennifer Lisa Smith, unreasonable in response to the provocation, if any, by the deceased, Jennifer Lisa Smith?

"Answer. Yes."

Because one or more questions were answered "no," defendant was not subject to the death penalty for the aggravated murder of Smith. The sentencing jury in the present case was asked the same three statutory penalty-phase questions with regard to the deaths of the Molalla Forest victims and answered each question "yes," and defendant therefore was sentenced to death.

Defendant argues that the state was precluded from relitigating the second question, *i.e.*, the issue of his future dangerousness, because the Smith homicide sentencing jury had answered that question in the negative. Defendant argues that all the elements necessary for the application of

---

[9] ORS 163.150 sets forth the procedures for conducting the penalty phase of a trial for aggravated murder. The 1987 version of the statute, which was in effect during both prosecutions of defendant, differed slightly from the 1985 statute, but only in ways not apposite to the present case. ORS 163.150 was amended also in 1989 and 1991. Because the trial court in the present case did not submit to the sentencing jury the statutorily authorized " 'fourth question,' *i.e.*, a query whether the death penalty is appropriate for this defendant, considering all aspects of his life and crime," and such a question is constitutionally required, this case must be remanded for a new sentencing proceeding. *Wagner II, supra*, 309 Or at 7, 16; see discussion *post* 313 Or at 387.

issue preclusion[10] are satisfied: the parties are the same, the state and defendant; the issue, defendant's future dangerousness, is the same; the state had a full and fair opportunity to litigate the issue; and the issue actually and necessarily was decided in the prior prosecution. Defendant contends that the preclusion doctrine on which he relies is embodied in Oregon statutory and constitutional provisions, as well as in the prohibition against double jeopardy guaranteed him by the Fifth and Fourteenth Amendments to the United States Constitution.

In *State v. Dewey*, 206 Or 496, 504-08, 292 P2d 799 (1956), this court held that ORS 43.160, which states a rule of issue preclusion that has its genesis in the common law, applies in criminal cases. ORS 43.160 provides:

> "That only is determined by a former judgment, decree or order which appears upon its face to have been so determined or which was actually and necessarily included therein or necessary thereto."

In discussing the application of issue preclusion in the criminal context, the *Dewey* court stated:

> "Where the second prosecution is for another offense, 'the previous judgment is conclusive only as to those matters which were in fact in issue and actually or necessarily adjudicated. Thus an acquittal of the charge of seduction does not adjudicate the question of sexual intercourse although that was one of the issues in the case, since the acquittal might have been due to the failure to establish other facts essential to a conviction.' " *State v. Dewey, supra*, 206 Or at 508 (quoting 2 Freeman on Judgments 1364-65, § 648 (5th ed 1925).

*See also State v. George*, 253 Or 458, 462-63, 466, 455 P2d 609 (1969) (following *State v. Dewey, supra*; conviction of a defendant for murder of one of two victims reversed, because the defendant previously had been acquitted of the murder of the other victim and both had died from the same bullet).

▮▮▮  The federal prohibition against double jeopardy prevents the state from seeking the death penalty in a retrial of a

---

[10] Although defendant, the federal cases, and older Oregon cases refer to the doctrine of "collateral estoppel," this court has noted that it is more precise to refer to "collateral estoppel" as "issue preclusion." *Drews v. EBI Companies*, 310 Or 134, 139, 795 P2d 531 (1990).

capital case when the sentencing jury refused to impose the death penalty at the first trial. *Bullington v. Missouri*, 451 US 430, 444-46, 101 S Ct 1852, 68 L Ed 2d 270 (1981) (because the penalty phase of a capital trial is like a trial on the issue of guilt or innocence, a verdict against the state demonstrates the jury's conclusion that the state failed to prove its case and is entitled to the same finality that characterizes an acquittal, even one on an erroneous ground). The federal Double Jeopardy Clause does not prevent the state from seeking the death penalty in a separate prosecution of the defendant for a *different* crime. *See United States v. Felix*, ___ US ___, 112 S Ct 1377, 1382, 118 L Ed 2d 25, 33 (1992) ("At its root, the Double Jeopardy Clause forbids the duplicative prosecution for the 'same offence.' U.S. Const., Amdt. 5").

There is also an issue preclusion component of the federal Double Jeopardy Clause. "[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 US 436, 443, 90 S Ct 1189, 25 L Ed 2d 469 (1970). In *Ashe*, the defendant was indicted in connection with the robbery of six players in a poker game. *Id.* at 437-38. Initially, he was tried for the robbery of one of the six players. *Id.* at 438. After he was acquitted, the state tried him for the robbery of another of the players. *Id.* at 439. The trial record from the first prosecution revealed that the sole issue litigated was whether the defendant was one of the robbers. *Id.* at 444-45 & n 9. Because the first jury's verdict was premised on the state's failure to prove the defendant's identity as one of the robbers, the Court held that the state was precluded from relitigating that issue, and the second prosecution was barred. *Id.* at 445-46. As noted above, the rule of issue preclusion is essentially the same in Oregon. *State v. George, supra*, 253 Or at 462-63; *State v. Dewey, supra*, 206 Or at 508.

The question here is whether the issue decided in the prior trial for the Smith homicide is the same issue that was presented to the jury in this case. The sentencing jury in the Smith case was instructed (as was the sentencing jury in the present case) as follows with regard to the second penalty-phase question:

"The second question asked by the law is:

"Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

"In determining this issue, you must consider any mitigating circumstances received in evidence, including, but not limited to, defendant's age, the extent and severity of the defendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the defendant was acting at the time the killing was committed."[11]

The issue presented by the second question in the present case differs from the second-question issue in the Smith case, because the sentencing jury in each case had to determine whether, based on everything in defendant's life to that point in time (including "the extent of the mental and emotional pressure under which the defendant was acting at the time the killing was committed"), defendant likely would be dangerous in the future. *See State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990) ("Evidence of all of a defendant's prior conduct, bad and good, is precisely the type of evidence that the jury needs to make this determination"); *Wagner II, supra*, 309 Or at 19 ("all aspects of a defendant's character and background are 'relevant to sentence' "). The trial in the present case took place nearly one year after the Smith homicide trial. Because everything that has occurred in a defendant's life may be relevant to a determination of that defendant's future dangerousness, the second-question determination necessarily incorporates a temporal element. The jury must determine a defendant's future dangerousness from the day on which the jury makes its determination forward, based on the defendant's life from that day backward. The year of defendant's life between the two trials and defendant's subsequent conviction in the guilt phase of this

---

[11] This instruction was based on ORS 163.150(1)(b)(B) (1987), which provided for the consideration of mitigating circumstances in connection with the second question. In *State v. Wagner*, 305 Or 115, 166-67, 752 P2d 1136 (1988) (*Wagner I*), *vacated on other grounds sub nom Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), this court held that ORS 163.150(1)(b) (1987) permitted a sentencing jury to consider mitigating evidence in answering all penalty-phase questions. In 1989, the legislature amended ORS 163.150 to make it explicit that the jury should consider mitigating evidence with regard to all the penalty-phase questions. ORS 163.150(1)(c) (1989).

case had not yet occurred at the time the Smith homicide jury rendered its verdict.[12]

In the present case, the second-question issue was, based on defendant's conduct and character up to the time of trial and the convictions and the circumstances of the aggravated murders of the six Molalla Forest victims,[13] whether defendant would pose a continuing threat to society. That issue is not the same issue decided by the Smith homicide jury. Because the sentencing juries were making their determinations at different times and based on different evidence — some of which was not available at the time of the Smith homicide trial — the sentencing verdicts in the two cases are neither inconsistent nor irreconcilable.

Because the second-question issue by its nature involves a temporal element — the future — and is based on a broad inquiry into a defendant's life bounded only by the present, the point at which the jury decides the issue, the issue to be decided changes continuously with time. Issue preclusion therefore is not available to defendant. The trial court did not err in denying defendant's motion to be declared ineligible for the death penalty.

## ISSUES CONCERNING THE TRIAL

Defendant's next assignment of error concerns the trial court's admission of evidence of other crimes and bad acts committed by defendant. Before trial, the state sought a ruling from the court concerning the admissibility of evidence

---

[12] Defendant, in fact, offered evidence of his good behavior while incarcerated prior to his trial in this case as probative on the issue of future dangerousness. In rebuttal, the state offered evidence, through the testimony of a psychologist, that defendant's conduct in prison suggested that defendant could be dangerous in the future in a prison society. *See State v. Douglas*, 310 Or 438, 450, 800 P2d 288 (1990) ("society" for purposes of future dangerousness determination includes prison society).

[13] The Smith sentencing jury was instructed that it must consider "*the extent of the mental and emotional pressure under which the defendant was acting at the time the killing was committed,*" in answering the second question. In order to determine defendant's mental and emotional state at the time of the killings, the juries necessarily would have to examine the circumstances of the aggravated murder of Smith. The sentencing jury in this case was given the same instruction concerning the second question and thus would have to look at the evidence concerning the circumstances of the aggravated murders of the Molalla Forest victims in order to determine defendant's mental and emotional state at the times of those killings. Hence, the second-question issues in the two cases were not the same.

about the Smith homicide and defendant's conduct with other prostitutes over the three and one-half years preceding his arrest for the Smith homicide. The state contended that this "other crimes" evidence was relevant to establish defendant's identity as the Molalla Forest murderer and to establish that defendant intended to torture, kidnap, sexually abuse, and kill his victims.

The trial court considered the state's offer of proof and issued a letter opinion, in which the court made preliminary findings of fact regarding the predicates for admissibility of other crimes evidence. The court concluded that some of the state's proffered evidence would be admissible. Because there is evidence to support the trial court's findings, there was no error in admitting the other crimes evidence.[14] *State v. Carlson*, 311 Or 201, 214, 217-19, 808 P2d 1002 (1991) (applying *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), to an OEC 104(1) determination by a trial court); *State v. Pinnell, supra*, 311 Or at 109-11 (affirming the trial court's OEC 104(1) findings regarding the admissibility of other crimes evidence); *see also State v. Johnson*, 313 Or 189, 195-97, 832 P2d 443 (1992) (setting forth the framework for analysis of other crimes evidence).

Defendant next contends that the trial court erred in overruling his demurrer to, and in denying his motion in arrest of judgment on, the third count of the indictment concerning the death of Cervantes for aggravated felony murder based on the commission or the attempt to commit the felony of sexual abuse in the first degree. Defendant argues that Count III of the indictment concerning Cervantes' death is indefinite and uncertain, because it does not set forth the theory of culpability for the felony underlying the aggravated murder charge. Defendant also asserts that, because the statutes authorize a conviction for aggravated felony murder for a murder committed during attempted first degree sexual abuse, ORS 163.095(2)(d) and 163.115(1)(b)(H), and because attempted first degree sexual

---

[14] Although the trial court did not issue final written findings of fact, "we will presume that the facts were decided in a manner consistent with the ultimate conclusion." *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

abuse was a misdemeanor, ORS 163.425(2) (1989)[15] and 161.405, Count III of the indictment for the death of Cervantes authorizes an aggravated murder conviction based on a misdemeanor. According to defendant, that possible result renders this application of the aggravated murder provisions unconstitutional as providing for cruel and unusual punishment. Defendant also contends that the aggravated murder statutes unconstitutionally deny him equal protection, because irrational classifications potentially subject defendants like him to a sentence of death for "aggravated misdemeanor murder" while the death penalty is not available for defendants convicted of intentional murder committed in the course of committing other felony sexual offenses.

■ ■ There is no constitutional infirmity in Count III of the indictment concerning Cervantes' death. There is nothing irrational about the legislature's determination that those who commit intentional murder in the course of committing or attempting to commit a first degree felony sex crime should be subject to possible imposition of the death penalty. Nor was it irrational for the legislature to include an attempt to commit a first degree felony sex crime, but not completed second or third degree felony sex crimes, in that classification. Rather, the legislature implicitly concluded, and could rationally conclude, that, because the difference between an attempted and a completed crime may be due to circumstances beyond a defendant's control, an intentional murder committed during an attempt to commit a first degree felony sex crime is more repugnant than an intentional murder committed during the course of a second degree felony sex crime.

■ ■ With respect to defendant's argument that imposition of the death penalty for what he characterizes as "aggravated misdemeanor murder" amounts to cruel and unusual punishment in violation of the state and federal constitutions, defendant's argument essentially is one of proportionality.

Article I, section 16, of the Oregon Constitution provides in part:

---

[15] In Oregon Laws 1991, chapter 830, sections 2 and 3, the legislature amended ORS 163.425 and added ORS 163.427, making first degree sexual abuse a Class B felony, for which an attempt is a Class C felony. ORS 161.405(2)(c).

"Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

The Eighth Amendment to the United States Constitution provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The standard for determining whether punishment is cruel and unusual is whether "the punishment [is] so proportioned to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *Sustar v. County Court of Marion County*, 101 Or 657, 665, 201 P 445 (1921) (citing *Weems v. United States*, 217 US 349, 367, 30 S Ct 544, 54 L Ed 793 (1910), for the Eighth Amendment standard and adopting that standard for purposes of Article I, section 16, of the Oregon Constitution); *accord Cannon v. Gladden*, 203 Or 629, 632, 281 P2d 233 (1955). Defendant asserts that it would shock the moral sense of reasonable people to impose the death penalty on the basis of a conviction for "aggravated misdemeanor murder."[16] We disagree. Imposition of the death penalty for an intentional murder committed by a person who was attempting to commit sexual abuse in the first degree would not shock the moral sense of reasonable people.

Finally, with respect to defendant's claim that Count III of the indictment is indefinite and uncertain because it does not specify the state's theory or the elements of sexual abuse, such a recitation of the elements was unnecessary. In *State v. Montez, supra*, 309 Or at 597, this court held that an aggravated murder indictment alleging concealment of other crimes as the aggravating factor need not set forth the elements of the underlying crimes. The present case is no different. The indictment tracks the language of ORS

---

[16] Even if this court were inclined to set aside the aggravated felony murder/sexual abuse count of the indictment concerning Cervantes' death, defendant has suffered no harm from its presence in the case and would not be entitled to any relief. Defendant was found guilty of two other counts of aggravated murder for killing Cervantes as well as two counts for each of the other five identified Molalla Forest victims. The evidence establishing the sexual abuse would have been part of the case in any event, because it was also evidence of intentional torture by defendant of Cervantes. Thus, even if the trial court should have dismissed the sexual abuse count, defendant still has been convicted properly of 12 counts of aggravated murder.

163.095(2)(d) and 163.115(1)(b)(H), the aggravated murder provisions with which defendant was charged. That is all that is required. *Ibid.* Therefore, the trial court did not err in overruling the demurrer and denying the motion in arrest of judgment as to Count III of the indictment concerning Cervantes' death.

■ Defendant also assigns as error the trial court's denial of his motion for mistrial based on a contact between one of the trial jurors and the mother of one of the victims in a courthouse rest room. Whether to grant a mistrial is a determination committed to the sound discretion of the trial court. As this court stated in *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990):

> "Our scope of review on the issue of whether a mistrial should have been declared is one of abuse of discretion: 'We have consistently held that a motion for a mistrial is addressed to the sound discretion of the trial judge.' *State v. Jones*, 242 Or 427, 433, 410 P2d 219 (1966). *See State v. Farrar*, 309 Or 132, 164, 786 P2d 161 (1990) (Trial judge is in the best position to 'assess and rectify the potential prejudice to the defendant.'). The question thus is not whether this court would have granted a new trial to defendant, but whether the trial court abused its discretion in refusing to do so."

Defendant argues that the trial court abused its discretion in denying his motion for mistrial.

■ Specifically, defendant contends that the trial court should have declared a mistrial after juror Sesko had a brief encounter, during the trial, in a courthouse rest room with the mother of one of the victims. On the fourth day of the guilt phase of the trial, while Sesko was washing her hands, she was approached by James, the mother of victim Hodges. James told Sesko either that she wanted "to thank" her or that she "appreciate[d] what [Sesko was] doing." James did not identify herself and Sesko did not respond to James' comment. Juror Sesko then left the rest room and reported the contact to the bailiff.

The following morning, in chambers and out of the presence of the jury, the court questioned Sesko and James separately. Both Sesko and James gave essentially the same account of their encounter in the rest room. Sesko testified

that she had assumed that James was defendant's mother and that after the encounter she had told only the bailiff and no other jurors about it. She also testified that she did not believe that the encounter would affect her decision in any way. Defendant moved for a mistrial, arguing that Sesko would realize that James was not defendant's mother and that she was being thanked in advance for convicting defendant and imposing a death sentence. The trial court denied the motion for mistrial, finding that Sesko was credible when she testified that she would decide the case based on the evidence presented and that the encounter would not affect her judgment. At defendant's request, the court gave the jury a cautionary instruction directing them to avoid all contact with the participants in this case.

The trial court did not abuse its discretion in denying defendant's motion for mistrial. The trial judge was in the best position to assess the potential prejudice to defendant and to rectify it. *State v. Farrar*, 309 Or 132, 164, 786 P2d 161, *cert den sub nom Wagner v. Oregon*, ___ US ___, 111 S Ct 212 (1990). The court's finding that juror Sesko was not contaminated by the contact and could still serve as an impartial juror was made after observing her testify. The record supports that finding. The court's cautionary instruction reiterated to the jury that the case was to be decided only on the evidence presented in the courtroom and that the jurors should not discuss the case as it was unfolding. Thus, the court acted to rectify the prejudice, if any, that may have resulted from Sesko's contact with James. There was no error.

■ In another guilt-phase assignment of error, defendant contends that the trial court should have instructed the jury that all the elements of the underlying felony had to be proven beyond a reasonable doubt in order to convict defendant of aggravated felony murder. He argues that the court's instructions were incorrect and prejudicial because they allowed the jury to convict on less than proof beyond a reasonable doubt as to the elements of the underlying felonies and could have resulted in a verdict that was not unanimous. The state asserts that defendant's proposed instructions were incorrect because, *inter alia*, they improperly would have required the jury to find that defendant had committed

the underlying felony in order to convict him of aggravated murder, whereas an *attempt* to commit the underlying felony would suffice. The state also argues that the instructions given were accurate and complete and that the trial court was under no obligation to give the instructions in defendant's wording.

The trial court's instructions told the jury that it must find each of the elements of aggravated felony murder beyond a reasonable doubt, including

"That the defendant either alone or with one or more persons committed or attempted to commit the [underlying felony];

"And that in the course of and in the furtherance of the [underlying felony], which the defendant was committing or attempting to commit, the defendant personally and intentionally caused the death of [the victim], who was not a participant in the crime."

The trial court's instructions then described the elements of each of the underlying felonies — kidnapping in the first degree, kidnapping in the second degree, and sexual abuse in the first degree — without reiterating that the state must prove the elements of the underlying felonies beyond a reasonable doubt. The instructions proposed by defendant concerning the aggravated felony murder counts reiterated the burden of proof before describing the elements of the underlying felonies.

The instructions given by the court accurately stated the law. The court was not required to give the burden of proof instructions in the particular form requested by defendant. *State v. Montez, supra,* 309 Or at 600-01. The court's instructions told the jury that it had to find beyond a reasonable doubt that defendant had committed or attempted to commit the underlying felony in the course of or in the furtherance of which he personally and intentionally caused the death of each victim, in order to convict him of each count of aggravated felony murder. Additionally, the court had instructed the jury generally that the burden of proof was on the state to prove the elements of each of the 13 counts of aggravated murder beyond a reasonable doubt. Read as a whole, the instructions clearly and distinctly informed the jury of the burden of proof on each of the counts of aggravated

felony murder. *See State v. Gowin*, 241 Or 544, 548, 407 P2d 631 (1965) (instructions as a whole definitely advised the jury of the law). The court therefore did not err in refusing to give defendant's requested instructions and in giving the instructions that it gave concerning the aggravated felony murder counts.

Defendant's last guilt-phase assignment of error is an attack on the sufficiency of the evidence and the trial court's denials of his motions for judgments of acquittal. Defendant's primary contention is that there was not sufficient evidence to establish beyond a reasonable doubt that he tortured, kidnapped, or sexually abused any of the Molalla Forest victims. In *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989), this court stated:

> "In ruling on the sufficiency of the evidence in a criminal case, the relevant question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Harris*, 288 Or 703, 721, 609 P2d 798 (1980). It is not proper for us to hold that there is a reasonable doubt because of conflicts in the evidence. After a verdict of guilty, such conflicts must be treated as if they had been decided in the state's favor. After the conflicts have been so decided, we must take such decided facts together with those facts about which there is no conflict and determine whether the inferences that may be drawn from them are sufficient to allow the jury to find defendant's guilt beyond a reasonable doubt. Our decision is not whether we believe defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for a jury so to find. *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974)."

*Accord State v. Walton*, 311 Or 223, 241-42, 809 P2d 81 (1991); *see Jackson v. Virginia*, 443 US 307, 319, 99 S Ct 2781, 61 L Ed 2d 560 (1979) (same standard for reviewing sufficiency of the evidence under the Fourteenth Amendment).

Defendant argues that there was no evidence that any of the victims was tortured. The aggravating factor of torture, ORS 163.095(1)(e), requires a separate specific intent to inflict intense physical pain, apart from the intent to do the acts causing death. *State v. Cornell/Pinnell*, 304 Or 27,

32, 741 P2d 501 (1987). Defendant asserts that there was no direct evidence that any of the victims suffered intense pain separate from the acts causing their deaths and that the other crimes evidence was not admissible for this purpose. Defendant's arguments with regard to the aggravated felony murder counts based on kidnapping and sexual abuse are also premised on his contention that there was no direct evidence of the underlying felonies and that the other crimes evidence was not admissible to prove that he intentionally deceived or confined any of the victims or that he forcibly subjected Cervantes to sexual contact by cutting off her nipple.

Defendant misconceives the limitation on other crimes evidence reflected in OEC 404(3). As this court concluded in *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986), OEC 404(3) is an inclusionary rule. Other crimes evidence is admissible if (1) it is independently relevant for a material purpose other than to establish a propensity to commit crimes, (2) the proponent has offered sufficient proof that the other crimes were committed and that the defendant committed them, and (3) the other crimes evidence is not subject to exclusion under OEC 403. *Id.* at 548, 555; *State v. Johnson, supra,* 313 Or at 195.

In the present case, the physical evidence — specifically, the condition of the mutilated bodies — indicated repeated stabbing and cutting wounds in addition to severed limbs. There was testimony that the infliction of those wounds would have caused intense physical pain to a victim who was alive and conscious. Other evidence established that defendant used cutting devices intentionally to inflict intense pain to prostitutes with whom he had encounters. In fact, several of the prostitute witnesses testified that defendant stopped inflicting pain when they stopped resisting him and exhibiting their pain. An inference may be drawn from that evidence that defendant intended to cause pain as a separate objective because, when his victims no longer appeared to be experiencing such pain, he stopped causing them pain. The other crimes evidence was admissible to prove that he had the same separate objective intentionally to cause intense pain to the Molalla Forest victims by inflicting stabbing and cutting wounds to them before killing them. *See State v. Walters,* 311

Or 80, 84-85 & n 5, 804 P2d 1164 ("[t]he jury could reasonably infer from that [other crimes] evidence that defendant possessed the identical intent to kidnap, rape, and sodomize this [victim]"), *cert den* 111 S Ct 2807 (1991).

With regard to the aggravated felony murder/kidnapping counts, there was sufficient evidence from which the jury could infer that defendant intended to deceive the Molalla Forest victims into accompanying him to the remote site in the forest where they were killed. Although several of the prostitute witnesses testified that they willingly accompanied defendant, they did so because of his promises not to harm them. When defendant in fact did harm them after tying them up, several of the prostitute witnesses testified that defendant refused at first to untie them and take them back to the city. One prostitute testified that she jumped out of defendant's pickup truck naked in order to escape from him. Although the witnesses' encounters may have begun consensually, defendant's conduct afterwards is indicative of both his intent to deceive those women initially and his intent to confine them against their wills. *See State v. Amell*, 303 Or 355, 358-60, 736 P2d 561 (1987) (even where an encounter begins consensually, a defendant commits kidnapping by deception where the defendant intends to interfere substantially with the liberty of another person, makes a misrepresentation calculated to induce reliance by that person to accomplish the interference, and that person relies on the misrepresentation). Further, the physical evidence found at the crime scene included binding devices, and one of the victims was found with her hands tied together above her head. Given that physical evidence and the other crimes evidence concerning defendant's intent with respect to the prostitute witnesses, it was reasonable for the jury to infer that, in taking the six victims to the Molalla Forest area, defendant had the same intent to deceive and confine them, and thus killed them in the course of kidnapping or attempting to kidnap them. *State v. Walters, supra*, 311 Or at 84-85 & n 5.

Finally, with respect to the aggravated felony murder/sexual abuse count concerning the death of Cervantes, it was reasonable for the jury to infer that defendant cut off her nipple in order to gratify his sexual desires and that

she did not consent to his doing so. The fact that the injuries to her breast would have been extremely painful and thus particularly gratifying to defendant is supported by other evidence concerning defendant's intent to cause intense pain and his conduct in threatening to cut, biting, or pinching the breasts of most of the prostitute witnesses in order to satisfy his sexual desires by causing them pain. Further, because defendant's sexual desires were not satisfied when his victim stopped experiencing pain, the jury reasonably could infer that defendant had caused the injuries to Cervantes' breasts while she was alive. The other crimes evidence establishing his intent to sexually abuse and the physical evidence of that forcible sexual contact was sufficient for the jury to find beyond a reasonable doubt that defendant personally and intentionally killed Cervantes in the course of sexually abusing her.

Because there was sufficient evidence to support the jury's verdict on each of the 13 counts of aggravated murder, the trial court did not err in denying defendant's motions for judgments of acquittal. In sum, we have considered all of defendant's guilt-phase assignments of error, including those not specifically discussed herein, and have concluded that no reversible error was committed by the trial court.

## ISSUES RELATING TO THE PENALTY PHASE

Defendant's other assignments of error concern the penalty phase of his capital trial. Because defendant's sentencing jury was not asked the so-called "fourth question" — whether the death penalty is appropriate for this defendant, considering all aspects of his life and crimes — this court's decision in *Wagner II, supra*, 309 Or at 7, 16, requires a remand for a new penalty-phase proceeding so that the "sentencing jury [is] given an effective opportunity to consider all aspects of * * * defendant's life and crime[s] in fixing the appropriate sentence." *See* ORS 163.150(1), (2), and (5)(a) and (d) (1991) (setting forth the procedures applicable on remand).

Defendant's remaining penalty-phase assignments of error concern conduct specific to the last sentencing jury which is moot, specific penalty-phase jury instructions that

may not be given or refused on remand, and the constitutionality of Oregon's death penalty statutes, which this court has previously upheld. *Wagner II, supra*, 309 Or at 16. Because it is likely to recur on remand, we do address one of defendant's penalty-phase assignments of error.

Defendant contends that the trial court erred in refusing to give the following proposed instruction:

"In determining which penalty to impose upon defendant, you may consider the irrevocable nature of the death penalty, as well as any residual doubt you may have as to any of the elements of the offenses for which defendant has been convicted.

"Residual doubt means that doubt that exists as to any of the element of the offenses for which defendant was charged, and exists when, although the evidence suffices to sustain the verdict of conviction of the crime, the evidence nonetheless does not foreclose all doubt as to defendant's guilt.

"In determining whether residual doubt exists as to defendant's guilt for purposes of assessing the penalty to be imposed, you may consider any factor creating such doubt, including, but not limited to: defendant's plea of the circumstantial nature of evidence; not guilty; the possibility of mistake by the judicial system; and the irrevocable nature of the death penalty."

Defendant argues that this so-called "residual doubt" instruction is a companion to the instructions concerning mitigation and the "fourth question" which should have been, but were not, given by the trial court.

In *Wagner II*, this court held that the federal constitution requires that a capital sentencing jury be given an adequate opportunity to consider all mitigating evidence and suggested that the sentencing jury be asked a "fourth question." 309 Or at 13-16. The decision in *Wagner II* was made on remand from *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), in which the Supreme Court of the United States vacated this court's decision in *State v. Wagner*, 305 Or 115, 752 P2d 1136 (1988) (*Wagner I*) (affirming the conviction and death sentence for that defendant), and remanded for reconsideration in light of *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989). *Wagner v. Oregon, supra*, 492 US at 914. Our decision in

*Wagner II* therefore was based on federal law. *Wagner II, supra,* 309 Or at 13, 16.

■ Defendant's argument concerning residual doubt is premised on *Wagner II's* reading of federal law. As a matter of federal law, defendant has no right to an instruction concerning residual doubt. *Penry v. Lynaugh, supra,* 492 US at 320; *see also Franklin v. Lynaugh,* 487 US 164, 173-74, 108 S Ct 2320, 101 L Ed 2d 155 (1988) (plurality) (no constitutional right to a residual doubt instruction); *id.* at 187-88 (concurrence in the judgment) (same).

Defendant makes no claim under any state statute or constitutional provision. In a sense, defendant's requested instruction suggests that there is really a fifth question that the jurors must consider. There is no basis in the law for giving such an instruction. Therefore, the trial court did not err in refusing to instruct the sentencing jury concerning residual doubt.

## CONCLUSION

We have considered all of defendant's guilt-phase assignments of error and have concluded that the trial court did not commit reversible error with respect to any of them. With respect to the penalty phase, the state was not precluded from seeking the death penalty for the crimes charged. However, because the sentencing jury was not asked the so-called "fourth question," defendant is entitled to a new penalty-phase proceeding. On remand, defendant is not entitled to an instruction on residual doubt.

The judgments of conviction for aggravated murder and aggravated felony murder are affirmed. The sentence of death is vacated. The case is remanded to the circuit court for further proceedings consistent with this opinion.

**FADELEY, J.,** dissenting in part.

I dissent from the remand for a new penalty-phase trial for the reason stated in the first three paragraphs of the dissenting opinion in *State v. Williams,* 313 Or 19, 44-45, 828 P2d 1006 (1992).

Specifically, the homicide in this case occurred at a time when the Oregon statute did not meet federal constitutional muster. The Supreme Court of the United States vacated the sentence and remanded a death penalty case to this court in *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). Thereafter, this court, by a majority vote, added 100 words to the statute in an effort to save it from the constitutional infirmity. *See State v. Moen*, 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting, detailing the 100-word addition to statute). The statute had been initiated and adopted in 1984. I do not believe this court had authority to make a substantial, significant, and after-the-fact addition to the 1984 statute that the people, by their vote adopting it, did not include.

Only the legislative branch may enact penal laws. I dissent.